# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No.  50818-4-II |
| ENDY DOMINGO-CORNELIO, | UNPUBLISHED OPINION |
| Petitioner. | |

BJORGEN, J.P.T.[*] — Endy Domingo-Cornelio petitions for relief from restraint stemming

from his convictions for first degree child rape and first degree child molestation.

Cornelio argues that he received ineffective assistance of counsel because his trial

counsel failed to (1) conduct an adequate pretrial investigation, (2) object to child hearsay

statements and cross-examine witnesses at the child hearsay hearing, and (3) adequately cross-

examine witnesses, object to impermissible opinion testimony, and object to prosecutorial

misconduct at trial.  He also argues that a significant change in the law relating to juvenile

offenses requires remand for resentencing.

We deny his petition.

---

[*] Judge Bjorgen is serving as a judge pro tempore for the Court of Appeals, pursuant to RCW
2.06.150.

.

FACTS

On October 13, 2012, A.C.[1] disclosed to her mother, T.C.,[2] that Cornelio had sexually abused her. At the time of disclosure, A.C. was 8 years old. The abuse occurred when she was four or five. Cornelio is A.C.'s cousin and would have been between 14 and 16 years old at the time of the alleged abuse.

A.C.'s parents, T.C. and Jose Cornelio,[3] finalized their divorce on October 12, 2012, the day before A.C.'s disclosure. The day of the disclosure, T.C. was on the phone with her sister asking why she had not testified on T.C.'s behalf at a child custody hearing. T.C. explained to her sister that she had wanted her to testify because T.C. believed Jose had had sexual contact with her sister while her sister was underage and T.C. suspected Jose had done the same or would do the same to A.C. or other underage family members. It was at that time that A.C., thinking that T.C. was talking about her, said that "it wasn't [Jose], it was [Cornelio]." Personal Restraint Petition (PRP), Ex. A, at 9. T.C. then called the police and met with an officer later that night to report the alleged abuse.

The State charged Cornelio with first degree child rape and three counts of first degree child molestation. The information alleged that each count occurred between November 2007 and November 2009.

---

[1] *See* Gen. Order 2011-1 of Division II, *In re the Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases*, http://www.courts.wa.gov/appellate_trial_courts.

[2] To protect A.C.'s privacy, we refer to her mother by initials.

[3] For the sake of clarity, we refer to him as Jose. We intend no disrespect.

I. PRE-TRIAL INVESTIGATION

Cornelio's trial counsel interviewed four witnesses: A.C., T.C., Jose, and Maria Perez (Jose's girlfriend). In his interview with T.C., counsel learned that A.C. had been acting out sexually with other children and adults and that AC had seen a counselor at age 4. There is no indication that counsel attempted to obtain records of A.C.'s counseling sessions.

In his interview with Jose, counsel learned that Cornelio's brother, Edgar Domingo-Cornelio,[4] typically stayed with Jose whenever Cornelio did. Counsel did not attempt to interview Edgar.

In his interview with A.C., counsel learned that A.C. disclosed her alleged abuse to her best friend three months before disclosing it to her mother. According to A.C., her friend is also a relative of Cornelio's and "told [A.C.] that it happened to her too." PRP, Ex. E, at 6. Counsel did not interview the friend. Counsel also learned that A.C. was concerned that T.C. was going to have Jose sent to jail and that A.C. "always tell[s] people" that she does not want Jose to go to jail. PRP, Ex. E, at 20, 22. A.C. also confirmed during this interview that she disclosed the abuse to her mother because she "kept asking" whether Jose had done something to her and she "got tired of her asking." PRP, Ex. E, at 13.

Counsel never interviewed several of Cornelio's family members whom Cornelio claims would have testified on his behalf. Among these is his mother, Margarita Cornelio,[5] who babysat A.C. for years prior to and after the alleged abuse. Cornelio asserts that Margarita would have testified that A.C. was never nervous or upset around him and that A.C. continued to enjoy coming over to their house even after the allegations surfaced. Cornelio also claims that other,

---

[4] For the sake of clarity, we will refer to him as Edgar. We intend no disrespect.

[5] For the sake of clarity, we refer to her as Margarita. We intend no disrespect.

unnamed family members would have testified that T.C. accused Jose of sexually abusing A.C. prior to A.C.'s disclosure of alleged abuse by Cornelio and that T.C. had a reputation for untruthfulness.

Cornelio also asserts in his petition that Edgar was at the house with A.C. and him "on almost every occasion" of the claimed abuse, that Edgar slept on a couch with Cornelio and A.C., and that Edgar never saw any interaction between Cornelio and A.C. PRP at 24-25. Cornelio's petition contains Edgar's declaration, which states that he and Cornelio "always spent the night at Jose's house together, with the exception of only a few times when I recall [Cornelio] spending the night without me." PRP, Ex. D, at 3. Edgar claims that every night he and Cornelio were at Jose's house together they slept on the small couches in the living room, while A.C. typically would sleep in Jose's room, but occasionally would sleep on the large couch in the living room. Edgar states in his declaration that he was willing to speak to counsel and testify that he had never seen Cornelio act inappropriately toward A.C. and that he is certain that he would have been aware of any inappropriate activity between them occurring at Jose's house.

Cornelio's investigator, Karen Sanderson, states in her declaration that police reports show that A.C. was exposed to drugs, violence, and neglect and left in the care of drug users while in the custody of her mother.[6] Cornelio claims counsel never pursued this line of inquiry. Sanderson's declaration also states that the documents she obtained from Cornelio's defense counsel "did not contain any court records indicating that he had gathered or reviewed" Jose and T.C.'s publicly available divorce records.[7]

---

[6] Cornelio does not include these reports in his petition, but relies on Sanderson's references to them in her declaration.

[7] Cornelio does not include these records in his petition, but relies on Sanderson's references to them in her declaration.

## II. CHILD HEARSAY HEARING

The trial court held a hearing the first day of trial to determine the admissibility of A.C.'s statements to T.C. and to forensic child interviewer Keri Arnold under RCW 9A.44.120. The State called T.C., Arnold, A.C., and Jose to testify. Defense counsel called no witnesses.

T.C. explained that A.C. had first disclosed to her that Cornelio had abused her after A.C. overheard T.C. on the telephone and A.C. thought that her mother was "saying that her dad had [done] something to her and she said it wasn't her dad, it was [Cornelio]." Verbatim Report of Proceedings (VRP) (Vol. I) at 100. T.C. reported asking A.C. why she had not told her something earlier because T.C. had questioned A.C. "multiple times" as a result of T.C. seeing A.C. "trying to do stuff with dolls and her brother and sister." VRP (Vol. I) at 99. T.C. denied that A.C. had ever accused anyone else of sexually abusing her.

T.C. explained that A.C. had been "a little instigator" when she was younger by lying to get her sister and brother in trouble. VRP (Vol. I) at 94. T.C. stated that A.C. had been caught lying about stealing candy from a store or items from her cousin's house. When asked whether A.C. understood that stealing was wrong, T.C. responded that A.C. was "getting there." VRP (Vol. I) at 95-96.

Arnold testified that she interviewed A.C. Arnold explained that she conducted a truth and lie exercise with A.C., which she said A.C. appeared to understand. Arnold testified that A.C. was able to promise to tell Arnold the truth without any difficulty and there was nothing during the interview that gave her any concern that A.C. had been coached. Arnold reported that A.C. had disclosed to her that Cornelio abused her.

A.C. testified that her mother had discussed with her the importance of telling the truth. A.C. affirmed that she had told the truth about Cornelio touching her and explained that she had told Arnold everything.

Jose testified that A.C. never complained about Cornelio. He also testified that he was not aware of A.C. alleging that anyone else had sexually abused her. Jose denied ever speaking with A.C. about her allegations against Cornelio and denied telling A.C. what to say when she came to court. Jose explained that A.C. had been caught lying about fighting with her sister, but also that A.C. would admit that she lied.

The State argued that A.C.'s statements to T.C. and to Arnold were admissible under RCW 9A.44.120 and under the *Ryan*[8] reliability factors. Defense counsel conceded that the factors had been met and did not object to the admission of the statements. The trial court admitted A.C.'s statements to T.C. and Arnold under RCW 9A.44.120 and the *Ryan* factors.

### III. TRIAL

A.C. testified at trial. She testified that Cornelio frequently would spend the night at Jose's house. A.C. reported that she would sleep on a little couch in the front room and Cornelio would sleep on a big couch in the same room. Jose testified that A.C. would sleep in his room when Cornelio came over. A.C. claimed the abuse occurred when both she and Cornelio were sleeping on the living room couches.

A.C. testified that Cornelio would tell her not to tell her father and then would do things that she did not like. She testified that Cornelio grabbed her behind, touched the part of A.C. that she used to go to the bathroom, and made her touch his part that he used to go to the bathroom. A.C. testified that these things happened more than one time. She stated that Cornelio put his

---

[8] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

mouth on her mouth, but denied that Cornelio put his mouth or tongue anywhere else on her body.

A.C. further testified that she did not tell her mother about the abuse when it was occurring because Cornelio told her not to. A.C. further explained that she did not tell any other adult because she "didn't want to tell on him," and she thought it was "none of their business." VRP (Vol. VI) at 508.

T.C. testified that A.C. had begun exhibiting sexual behaviors well before the alleged abuse. This made T.C. concerned that something had happened to A.C. and prompted T.C. to repeatedly ask A.C. if she had ever been abused. A.C. had always denied any abuse.

T.C. testified that A.C.'s disclosure occurred when A.C. overheard her talking on the phone because A.C. thought T.C. was talking about her. T.C. did not mention that at that moment she was discussing her suspicions that Jose had acted inappropriately with her sister and that she was concerned he was also acting inappropriately with A.C.

Arnold testified that delayed disclosure from children is typical, and "more often than not" disclosure occurs months or even years after the abuse occurred. VRP (Vol. VI) at 428. She explained that it is common for children to fear that their disclosure might get a family member in trouble. She also testified that children often share graphic details of abuse without "crying or appearing to have a significant emotional response." VRP (Vol. VI) at 456. She explained that "[c]oaching refers to the concern that a child is making a false allegation because they are being instructed to do so by another individual." VRP (Vol. VI) at 450-51. She then testified that nothing from her interview with A.C. "caused [her] any concern for suggestibility or coaching." VRP (Vol. VI) at 476. Defense counsel did not object to these statements, but did

cross-examine Arnold on the coaching issue and asked her whether a divorce could factor into a child's suggestibility.

During closing argument, the prosecutor stated that A.C.'s testimony was all that was required to find the abuse beyond a reasonable doubt. She then went on to say the following:

> Can you imagine a system where we did require something else? You have heard the testimony. Also, apply your common sense and experience here. Kids often don't tell about abuse that they have suffered until well after it's over and done with, or has been happening for years. It could be a period of months, but more often than not, it's years later, if they ever tell.
>
> . . . . Most of the time, 95 percent of the time, there is no physical findings. And according to the law, our law here in Washington State, that doesn't matter. You don't need that additional evidence.
>
> It doesn't matter that these things don't exist in this case. In such a system, most children would have to be told, sorry, we can't prosecute your case, we can't hold your abuser responsible because there is nothing to corroborate what you are telling us and [no one] is going to believe a child. We don't have a system like that. That's not how our system works. A child telling you what happened to them is evidence and it's enough.
>
> If more was required, we couldn't hold the majority of abusers responsible, including this abuser. We couldn't hold this defendant responsible for what he did to [A.C.].

VRP (Vol. VII) at 674-75. Defense counsel did not object.

The jury found Cornelio guilty of one count of first degree child rape and three counts of first degree child molestation.

## IV. SENTENCING

At sentencing, Cornelio's offender score was calculated as 9, and his standard sentencing range was 240-318 months. Defense counsel argued for the low end of the range because Cornelio was a juvenile when the incidents occurred, but did not argue for an exceptional sentence below that range based on Cornelio's youth. The trial court sentenced Cornelio to the minimum 240 months in prison with 36 months of community custody.

V. APPEAL

Cornelio appealed, and we affirmed his convictions in an unpublished opinion. *State v. Cornelio*, No. 46733-0-II, slip op. at 193 Wn. App. 1014 (Wash. Ct. App. Apr. 5, 2016) (unpublished).[9] Among the issues discussed in the direct appeal were Cornelio's arguments that he received ineffective assistance of counsel because his trial counsel failed to object to (1) the admission of child hearsay statements and (2) prosecutorial misconduct during closing argument. We held against each of those arguments.

On August 31, 2016, Cornelio's petition for review to the Supreme Court was denied. *State v. Cornelio*, No. 93097-0, 186 Wn.2d 1006 (2016). On August 30, 2017, he filed this PRP.

ANALYSIS

I. PRP LEGAL PRINCIPLES & STANDARD OF REVIEW

We will grant appropriate relief to a petitioner who is under unlawful restraint for one or more of the reasons set out RAP 16.4(c). RAP 16.4(a). To obtain relief through a PRP, a petitioner must generally "establish that a constitutional error has resulted in actual and substantial prejudice, or that a nonconstitutional error has resulted in a fundamental defect which inherently results in a complete miscarriage of justice." *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 298, 88 P.3d 390 (2004). Among other reasons, a restraint may be unlawful when there has been a significant change in the law which is material to the petitioner's sentence and sufficient reasons exist to require retroactive application of the changed legal standard. RAP 16.4(c)(4).

"As a general rule, 'collateral attack by [PRP] on a criminal conviction and sentence should not simply be a reiteration of issues finally resolved at trial and direct review, but rather

---

[9] Http://www.courts.wa.gov/opinions/pdf/467330.pdf.

should raise new points of fact and law that were not or could not have been raised in the principal action, to the prejudice of the defendant.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 670-71, 101 P.3d 1 (2004) (footnotes omitted) (quoting *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388-89, 972 P.2d 1250 (1999)). A "new" issue is not created merely by supporting a previous ground for relief with different factual allegations or with different legal arguments. *Id.* at 671. "The petitioner in a [PRP] is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." *Id.* (footnotes omitted). The interests of justice may be served by reconsidering a ground for relief if there has been an intervening material change in the law or some other justification for having failed to raise a crucial point or argument on appeal. *Gentry*, 137 Wn.2d at 388.

The petitioner "must support the petition with facts or evidence and may not rely solely on conclusory allegations." *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 488, 251 P.3d 884 (2010); RAP 16.7(a)(2)(i). For allegations "'based on matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief.'" *Id.* (quoting *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992)).

> If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence. The affidavits, in turn, must contain matters to which the affiants may competently testify.

*Rice*, 118 Wn.2d at 886. The rules applicable to PRPs "do not explicitly require that the petitioner submit evidence, but rather the petition must identify the existence of evidence and where it may be found." *In re Pers. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 641, 362 P.3d 758 (2015). That being said, "[h]earsay remains inadmissible under *Rice* and is not a basis for

granting a reference hearing or other relief." *In re Pers. Restraint of Moncada*, 197 Wn. App. 601, 608, 391 P.3d 493 (2017).[10]

The petitioner must also show by a preponderance of the evidence that he was prejudiced by the error. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). If the petitioner fails to meet his threshold burden of showing prejudice, the petition must be dismissed. *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983). If the petitioner makes a prima facie showing of prejudice, but the merits of the contentions cannot be determined solely on the record, we will transmit the petition to the trial court for a full hearing on the merits or a reference hearing pursuant to RAP 16.11(a) and RAP 16.12. *Id.* If we are convinced the petitioner has proven actual prejudicial error, we will grant the PRP. *Id.*

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Cornelio argues that he received ineffective assistance of counsel in several respects, thereby denying him his right to a fair trial.[11]

A.    Legal Principles and Standard of Review

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right of a criminal defendant to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674

---

[10] *Moncada* reasoned that "*Ruiz-Sanabria* did not overrule or modify *Rice* . . . nor did *Ruiz-Sanabria* involve the question of admitting hearsay . . . *Ruiz-Sanabria* did not change the evidentiary standards for obtaining a reference hearing." 197 Wn. App. at 607.

[11] Cornelio contends that the State's brief concedes two of his ineffectiveness claims (failing to object to improper vouching and failing to object to errors of constitutional magnitude in closing argument) by failing to argue them. We disagree. Although the State does not present a detailed argument on those specific ineffectiveness issues, it does argue that those claims fail to meet the evidentiary requirements of PRPs and were previously decided on the merits in Cornelio's direct appeal.

11

(1984); *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). Ineffective assistance of counsel is a mixed question of law and fact and is reviewed de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). Washington follows the *Strickland* test: the defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. 466 U.S. at 687; *State v. Cienfuegos*, 144 Wn.2d 222, 226, 25 P.3d 1011 (2011) (stating Washington has adopted the *Strickland* test).

A trial counsel's performance is deficient if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is a "strong presumption that counsel's performance was reasonable," *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009), and a defendant bears the burden of establishing deficient performance. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). A defendant can rebut this presumption by demonstrating that "there is no conceivable legitimate tactic explaining counsel's performance." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). That said, the "relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000). In evaluating ineffectiveness claims, we must be highly deferential to counsel's decisions. *State v. Michael*, 160 Wn. App. 522, 526, 247 P.3d 842 (2011).

In the context of a PRP, a petitioner claiming ineffective assistance of trial counsel necessarily establishes actual and substantial prejudice if he meets the standard of prejudice applicable on direct appeal. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). To show prejudice, the defendant must show that but for counsel's deficient performance there is a reasonable probability the outcome of the proceeding would have been different. *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011). "A reasonable probability is

a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694;

*Thomas*, 109 Wn.2d at 226.

Even if a petitioner raised a claim of ineffective assistance of counsel on direct appeal,

the petitioner may assert ineffective assistance on a different basis on collateral review. *In re*

*Pers. Restraint of Khan*, 184 Wn.2d 679, 688-89, 363 P.3d 577 (2015).

B.      Pretrial Investigation

Cornelio first argues that his trial counsel's performance was deficient because he failed

to obtain records and interview key witnesses prior to trial. Specifically, he claims that his trial

counsel (1) did not seek A.C.'s counseling records which allegedly contradict her claims of

abuse, (2) failed to obtain public divorce records that allegedly showed that A.C. was exposed to

many men during the time of the alleged abuse and that identified the exact date of the divorce as

the day before A.C. accused Cornelio, and (3) failed to interview family members who had daily

interactions with A.C. during the time of the alleged abuse, including Cornelio's brother Edgar,

who Cornelio alleges stayed with him nearly every time he spent the night at Jose's house.[12]

Counsel has a duty to make reasonable investigations or to make a reasonable decision

that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691. *Strickland*

elaborated:

> The reasonableness of counsel's actions may be determined or substantially
> influenced by the defendant's own statements or actions. For example, when the
> facts that support a certain potential line of defense are generally known to counsel

---

[12] Cornelio also claims his counsel failed to interview key prosecution witnesses, including those who provided the most damaging child hearsay evidence at trial, but does not provide any further argument. He does not specify which witnesses he is referring to, and he does not give evidence that counsel failed to interview them or explain how he was prejudiced. Furthermore, as evidenced from Cornelio's own petition, counsel did interview T.C., Jose, and A.C. before trial. The trial transcript also reveals that counsel cross-examined other witnesses for the State, and there is no indication that having not interviewed them beforehand harmed counsel's preparation or performance with respect to those witnesses. We accordingly reject this claim.

because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.

*Id.*

Effective assistance of counsel requires that trial counsel investigate the case, which includes witness interviews. *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). "Failure to investigate or interview witnesses, or to properly inform the court of the substance of their testimony, is a recognized basis upon which a claim of ineffective assistance of counsel may rest." *State v. Ray*, 116 Wn.2d 531, 548, 806 P.2d 1220 (1991). Courts will not defer to trial counsel's uninformed or unreasonable failure to interview a witness. *Jones*, 183 Wn.2d at 340. However, "there is no absolute requirement that defense counsel interview witnesses before trial." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 488, 965 P.2d 593 (1998).

Whether a failure to interview a particular witness constitutes deficient performance depends on the reason for the trial lawyer's failure to interview. *Jones*, 183 Wn.2d at 340. In addition, a defendant raising a "failure to investigate" claim must show "a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." *Davis*, 152 Wn.2d at 739. Even if a defendant can show such information would have been uncovered, the potential resulting prejudice "'must be considered in light of the strength of the government's case.'" *Id.* (quoting *Rios v. Rocha*, 299 F.3d 796, 808-09 (9th Cir. 2002)).

1. Counseling and Divorce Records

Cornelio claims that A.C.'s counseling records "capture both the lack of allegations of abuse during the relevant time periods that A.C. now claims she was abused, but also detail the alleged abuse after she made her initial allegations." PRP at 23. He also claims that Jose's and T.C.'s divorce records show that A.C. was exposed to many men and inappropriate situations

during the years when the abuse allegedly took place and confirmed that A.C.'s disclosure occurred the day after the divorce was finalized. These records also purportedly show that Jose had concerns that T.C. was influencing what A.C. was saying during the custody battle.

Cornelio argues that counsel's failure to obtain these records and bring out their content at trial was deficient performance, particularly because the timing of the divorce was critical to the defense's case that A.C.'s disclosure was related to her parents' separation and custody battle.

There is nothing in the record to suggest why defense counsel declined to pursue A.C.'s counseling records or the divorce records. Cornelio claims that counsel knew of these records' existence but clearly did not know their content. Cornelio does not provide us with these records. With respect to the counseling records, Cornelio does not present any direct evidence of their content, but claims that T.C. took A.C. in for counseling "to explore her sexual abuse history." PRP at 2-3. In support, Cornelio cites Exhibit A of his petition and VRP (Vol. VII) at 561-564. These sources do not state that A.C. was in counseling to explore sexual abuse history, but do suggest that A.C. was referred for therapy at least in part due to inappropriate boyfriend-girlfriend play with other children and straddling the legs of adult male visitors. See PRP, Exhibit A, at 18-20, 28-30; VRP (Vol. VII) at 564. As for the divorce records, Cornelio relies on Sanderson's declaration to show that they contain evidence to support his claims.[13]

The State argues that none of the evidence that Cornelio relies on in his PRP is admissible. Because Sanderson's declaration relies on matters outside the existing record, Cornelio must demonstrate that he has "competent, admissible evidence to establish the facts that

---

[13] Cornelio also cites Sanderson's declaration to support his claim that trial counsel never sought A.C.'s counseling records, but that declaration does not mention counseling records.

entitle him to relief." *Monschke*, 160 Wn. App. at 488. Contrary to the State's claim, Sanderson's declaration need not be admissible itself, but must merely establish that Cornelio possesses competent, admissible evidence. *Id.*

Cornelio makes no argument that A.C.'s counseling records would be admissible, and they are likely protected by privilege. Moreover, even considering the partial purposes of the counseling described above, he does not show a reasonable likelihood that investigation of the counseling records would have produced useful information not already known to counsel. *Davis*, 152 Wn.2d at 739. In the absence of any argument or authority that the counseling records would be admissible, we cannot assume that they would be. In addition, Cornelio has not shown under the standards above that trial counsel was deficient in not pursuing the counseling records or that counsel's failure to pursue them resulted in prejudice to him. We therefore hold against Cornelio's claims based on A.C.'s counseling records.

However, it is likely that her parents' publicly available divorce records would be admissible. Hence, with respect to the divorce records, Cornelio has met his burden to show that he possesses competent, admissible evidence. *Id.*

To show his counsel was deficient, Cornelio must demonstrate a reasonable likelihood that investigation of the divorce records would have produced useful information not already known to counsel. *Davis*, 152 Wn.2d at 739. There is some support in the record for Cornelio's contention that defense counsel did not know the exact date the divorce was finalized, as he could not refresh Jose's memory when Jose struggled to provide that date on cross-examination. However, counsel established in his cross-examination of T.C. that the divorce was finalized on October 12 and that she contacted the police about A.C.'s disclosure "the day after." VRP (Vol. VII) at 565. Furthermore, in his closing argument counsel argued that the disclosure occurred

"right around that time when Jose got custody of the children after a court battle." VRP (Vol. VII) at 696. In addition, counsel highlighted the concerns regarding A.C.'s suggestibility and coaching that were echoed in the divorce proceedings.

It does not appear that investigation of the divorce records would have produced any useful information not already known to counsel. *Davis*, 152 Wn.2d at 739. The record shows that counsel knew, and established for the jury, that the divorce occurred the day before A.C.'s disclosure and that there were concerns that she was being influenced by her mother. Because Cornelio has not shown that further investigation would have produced new information, he cannot demonstrate deficient performance on this basis.

2. Potential Witnesses

Cornelio also argues counsel was deficient in failing to interview A.C.'s friend and several of Cornelio's family members, including his brother. We examine each of these potential witnesses in turn.

i. A.C.'s friend

First, we conclude it was not deficient performance for counsel not to interview A.C.'s friend, to whom A.C. disclosed her alleged abuse by Cornelio several months before her disclosure to T.C. According to A.C., her friend is also a relative of Cornelio's and "told [A.C.] that it happened to her too." PRP, Ex. E, at 6. In fact, the friend separately reported to police that her male cousin exposed his penis to her, but could not remember any more details or identify the man by name. This suggests that it was a strategic choice not to interview A.C.'s friend, since counsel would have had reason to believe that the friend would only corroborate A.C.'s allegation. Under the circumstances, it was reasonable for counsel not to pursue this line of inquiry.

17

ii. Family Members

Sanderson states in her declaration that unnamed family members reported that T.C. had accused Jose of abusing her sister and A.C. for years and that T.C. was not trustworthy. Additionally, according to Sanderson's declaration, those family members reported that A.C. never appeared nervous or uncomfortable around Cornelio and never complained about coming over to Cornelio's house, where Margarita would babysit her. Sanderson's declaration also states that Margarita reported that she had almost daily contact with A.C. during the years the abuse took place, and she continued to babysit A.C. even after the allegations were made.

Cornelio has not provided us with statements by these family members, nor has he suggested that they would have been willing and able to testify at trial. The State argues that the family members' statements referenced in the declaration are inadmissible hearsay and should not be considered.

With respect to the statements of Cornelio's family members, Sanderson's declaration does not meet the evidentiary standard of *Rice.* Sanderson cannot competently testify to the hearsay statements contained within her declaration, and Cornelio has made no argument that they fall under any hearsay exception. *See Rice*, 118 Wn.2d at 886. Instead he argues that these statements serve as "other corroborative evidence," and that such evidence can include hearsay. Reply Br. of Pet'r at 8. However, "[h]earsay remains inadmissible under *Rice* and is not a basis for granting a reference hearing or other relief." *Moncada*, 197 Wn. App. at 608.

Because Cornelio has not shown that he has competent, admissible evidence of what his family members would testify to, we reject his claim of ineffective assistance counsel based on his counsel's failure to interview them. *Monschke*, 160 Wn. App. at 488.

iii. Edgar

Finally, Cornelio claims that his brother Edgar would have testified that he was with Cornelio at Jose's house on almost every occasion and never saw Cornelio act inappropriately with A.C.

Unlike Cornelio's other family members, Edgar submitted his own declaration outlining what he would have testified to. He claims that he and Cornelio "always spent the night at Jose's house together, with the exception of only a few times when [he] recalls [Cornelio] spending the night without [him]." PRP, Ex. D, at ¶6. Edgar claims that every night he and Cornelio were at Jose's house together they slept on the small couches in the living room, while A.C. typically would sleep in Jose's room but occasionally would sleep on the large couch in the living room. Edgar would have testified that he had never seen Cornelio act inappropriately toward A.C. and that he is certain that he would have been aware of any inappropriate activity between them occurring at Jose's house. As Edgar has firsthand knowledge of the facts he would testify to, his declaration does "contain matters to which [he] may competently testify." *Rice*, 118 Wn.2d at 886. His declaration therefore satisfies the evidentiary standards of *Rice*.

Even if we assume without deciding that Cornelio's trial counsel was deficient for failing to interview Edgar, Cornelio must still demonstrate prejudice. We hold he was not prejudiced.

Cornelio argues he was prejudiced because Edgar's testimony would have directly contradicted much of what A.C. claimed at trial. Specifically, Cornelio claims that Edgar's statement that he always slept on the living room couches with Cornelio, yet never saw Cornelio act inappropriately with A.C., would have created a "reasonable chance that some jurors, or even one juror, would have found [Cornelio] not guilty." PRP at 25.

19

Cornelio relies on *Jones*, which involved a "credibility contest" between the State's witnesses and the defendant's witnesses. 183 Wn.2d at 344. *Jones* concluded that the defendant was prejudiced because defense counsel did not interview a witness who (1) would have directly contradicted the alleged victim's version of events, (2) would have corroborated similar testimony of another witness, (3) would have provided "very defense-favorable testimony" that the defendant was in fact the victim, and (4) was a neutral observer with no relationship to either the defendant or the alleged victim. *Id.* at 341-43.

This case is distinguishable from *Jones*. First, although Edgar would have contradicted A.C.'s description of the sleeping arrangements, he would not be able to directly contradict her claims of abuse because he could not have provided an alibi for the nights when he did not join Cornelio at Jose's house. Second, although Edgar's testimony that he never saw Cornelio act inappropriately would have supported Jose's testimony to that point, he also would have contradicted Jose's favorable testimony that A.C. always slept in Jose's room when Cornelio was there.

For these reasons, we hold that Cornelio was not prejudiced because there is not a reasonable probability the outcome of the trial would have been different had defense counsel interviewed Edgar.

3. Cumulative Effect

To the extent Cornelio argues cumulative error, he does not demonstrate ineffective assistance of counsel taking each of these alleged failures to investigate cumulatively. As discussed above, much of the evidence Cornelio identifies does not meet PRP evidentiary standards. The remaining evidence either does not provide new information previously unknown to counsel or lacks the exculpatory strength, even taken together, to suggest that but for its

20

exclusion there is a reasonable probability that Cornelio would have been acquitted. We reject Cornelio's argument of ineffective assistance counsel for failure to investigate the case.

C.      Child Hearsay Hearing

Cornelio's second ineffective assistance claim is that his trial counsel failed to cross-examine witnesses at the child hearsay hearing or object to admission of child hearsay statements.[14] Cornelio presents several bases for objecting to A.C.'s statements based on the factors espoused in *Ryan*: (1) there was evidence that A.C. had a reputation for untruthfulness, as articulated by her mother at the hearsay hearing, (2) the disclosure was not spontaneous, but was in response to her mother's continued assertions that A.C. was being abused by Jose, and (3) the timing of the disclosure and facts surrounding the custody battle for A.C. were not discussed as an apparent motive to lie. He argues that there was no legitimate strategic or tactical reason for his trial counsel to concede the admission of A.C.'s hearsay statements.

We rejected Cornelio's claim regarding his trial counsel's failure to object to the admission of those statements in his direct appeal. *Cornelio*, slip op at 193 Wn. App. 1014. Cornelio must therefore demonstrate that the interests of justice require relitigation of that issue. *Davis*, 152 Wn.2d at 671. He argues that we should revisit this issue because he raises new facts and analysis not raised in his direct appeal and the alleged error was manifest error affecting a constitutional right. *In re Pers. Restraint of Percer*, 111 Wn. App. 843, 847, 47 P.3d 576 (2002) ("In light of the clear error involving a constitutional right, we reexamine the issue in the

---

[14] Although Cornelio claims ineffective assistance based on his counsel's failure to cross-examine witnesses in his grounds for relief, he does not provide any argument in support of this assertion and instead focuses exclusively on his counsel's failure to object. Hence, we decline to consider it. RAP 10.3(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

interests of justice."). Specifically, he maintains that his direct appeal did not focus on the lack of meaningful adversarial testing of the prosecution's case by his trial counsel, nor did it argue that the issue involved a manifest error affecting a constitutional right. He contends that the interests of justice will be served because this issue was only "cursorily discussed" in his direct appeal. Reply Br. of Pet'r at 12.

We hold this is insufficient justification to relitigate this issue. "[S]imply recasting" a previously rejected legal argument "'does not create a new ground for relief or constitute good cause for reconsidering the previous rejected claim.'" *Davis*, 152 Wn.2d at 671 (quoting *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001)). Moreover, there is no "clear error" involving Cornelio's constitutional right to counsel with respect to the child hearsay hearing. *Percer*, 111 Wn. App. at 847. Trial counsel's decision about whether to object is a classic example of trial tactics and only in egregious circumstances relating to evidence central to the State's case will the failure to object constitute incompetent representation that justifies reversal. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Even assuming Cornelio meets this standard, he does not show prejudice: that the trial court would have sustained the objections if made and the result of the proceeding would likely have been different. *See State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

As we noted in Cornelio's direct appeal, despite defense counsel's concession on the *Ryan* factors, the trial court nevertheless provided a detailed analysis of those factors and concluded that A.C.'s hearsay statements were admissible under RCW 9A.44.120. *See Cornelio*, slip op at 193 Wn. App. 1014. The trial court made specific findings that A.C. was truthful, her disclosure was spontaneous, and she had no apparent motive to lie. The fact that the court

independently found the *Ryan* factors met strongly suggests it would not have sustained an objection arguing the contrary or chosen to exclude the statements.

Moreover, even if Cornelio could show that the court may have decided differently with respect to any or each of the three *Ryan* factors he points to in his petition, he must also show that the trial court would probably have ruled differently with respect to its consideration of all the *Ryan* factors taken together. *See Kennealy*, 151 Wn. App. at 881 ("No single *Ryan* factor is decisive and the reliability assessment is based on an overall evaluation of the factors."). He has not done so. We are satisfied there was no clear error and that Cornelio has not shown a reasonable probability that the trial court would have ruled differently had he objected.

Cornelio also argues that his circumstance warrants a presumption of prejudice because by failing to object to the hearsay statements his counsel "'entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing.'" PRP at 33 (quoting *Davis*, 152 Wn.2d at 673-75). This "'presumptive prejudice rule'" is limited to circumstances comparable to "'the complete denial of counsel'" in the context of the entire representation. *Davis*, 152 Wn.2d at 674-75 (quoting *Visciotti v. Woodford*, 288 F.3d 1097, 1106 (9th Cir. 2002)). That was not the case here. Defense counsel cross-examined witnesses, raised objections to evidence, presented closing argument to the jury, and advocated for a shorter prison sentence at sentencing. *See id.* at 675.

For these reasons, we hold there was no clear error affecting a constitutional right and the interests of justice do not require us to reconsider our holding on direct appeal that Cornelio was not prejudiced by his counsel's performance at the child hearsay hearing.

D.    At Trial

Cornelio's final grounds for arguing ineffective assistance of counsel rest on his counsel's performance at trial. Specifically, he argues his counsel failed to (1) cross-examine witnesses, (2) object to impermissible opinion testimony, and (3) object to prosecutorial misconduct in closing argument.

1. Cross-Examination

Cornelio argues his counsel was deficient in failing to meaningfully cross-examine key witnesses who testified against him. Specifically, Cornelio contends his counsel was deficient because he failed to highlight T.C.'s suspicions that Jose had been abusing A.C. and that A.C. had been exhibiting sexually inappropriate behaviors before the alleged abuse by Cornelio. He also argues his counsel "seemed confused at best" in failing to effectively cross-examine Jose and T.C. about the timing of A.C.'s disclosure to highlight that it occurred the day after their divorce. PRP at 35.

The extent of cross-examination is a matter of judgment and strategy. *Davis*, 152 Wn.2d at 720. We will not find ineffective assistance of counsel based on trial counsel's decisions during cross-examination if counsel's performance fell within the range of reasonable representation. *Id.*

Although counsel may not have emphasized this information as much as Cornelio would have liked, the fact remains that most of this information was established on the record for the jury to consider. Counsel did not explicitly draw out the fact that A.C. was exhibiting sexualized behaviors before the alleged abuse, but he did establish that A.C. claimed she learned those behaviors from movies and that starting when A.C. was three years old T.C. had harbored suspicions that Jose had abused A.C. Counsel's choice to highlight where A.C. learned those

behaviors, rather than when she exhibited them, fell within the range of reasonable representation.

As for the timing of the disclosure, although counsel did not clarify the timing during Jose's testimony, he did establish on cross-examination of T.C. that A.C.'s disclosure occurred the day after the divorce was finalized. Counsel's performance in drawing out this fact for the jury to consider likewise fell within the range of reasonable representation.

Cornelio's argument essentially "amounts to an assertion that trial counsel could have done a better job at cross-examination. This is not enough to demonstrate deficient performance." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). We hold counsel was not deficient.

2. Improper Opinion Testimony[15]

Cornelio next claims that his trial counsel failed to object when the State's witness improperly commented on A.C.'s credibility.[16] Specifically, Cornelio claims that Arnold improperly stated that she had "no concern" that A.C. was coached or that suggestibility affected her disclosure, improperly discussed that delayed disclosure was "typical," and improperly

---

[15] In his grounds for relief, Cornelio characterizes this argument as part of his claim of ineffective assistance of counsel. However, in arguing this issue he instead presents the standard for manifest error of constitutional magnitude, which is an exception to the rule that an appellate court may refuse to review an unpreserved error on direct appeal. RAP 2.5(a). As that is the standard on direct appeal, rather than in a PRP, we instead analyze this claim under the ordinary framework for ineffective assistance of counsel for failure to object.

[16] Cornelio initially characterizes this claim as improper vouching, which occurs when a prosecutor expresses a personal belief in a witness's credibility. *See State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). However, his argument in fact is not that the State prosecutor vouched for A.C.'s credibility, but that the State's witness provided impermissible opinion testimony on A.C.'s credibility.

suggested that it was common for children not to show a significant emotional response when talking about their abuse. PRP at 36; VRP (Vol. VI) at 428-29, 455-56, 476.

No witness may state an opinion about a victim's credibility because such testimony "invades the jury's exclusive function to weigh the evidence and determine credibility." *State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992). Impermissible opinion testimony regarding the defendant's guilt may be reversible error because it violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

Testimony on general child victim interview protocol does not improperly comment on the truthfulness of the victim. *Kirkman*, 159 Wn.2d at 934. Furthermore,

> it has long been recognized that a qualified expert is competent to express an opinion on a proper subject even though he thereby expresses an opinion on the ultimate fact to be found by the trier of fact. The mere fact that the opinion of an expert covers an issue which the jury has to pass upon, does not call for automatic exclusion.

*Id.* at 929 (internal citations omitted).

Cornelio argues that Arnold's explanations of delayed disclosure and children's lack of emotional response to recounting their abuse improperly went beyond general testimony about child victim interview protocol. We disagree.

Arnold at no time linked her discussions of delayed disclosure or the common lack of emotional response from child victims to A.C. specifically; she merely described some of the psychological factors that generally bear on how children might act and present themselves after they are abused or in recounting their abuse. The jury was then left to weigh this general information in its consideration of A.C.'s credibility.

26

Cornelio also argues that Arnold's statement that she had no concern that A.C. had been coached amounted to an "explicit statement regarding the accuracy and truthfulness of A.C.'s accusations" and that, therefore, trial counsel's failure to object to it was a manifest constitutional error. PRP at 38. Again, we disagree.

Arnold did not say that A.C. was telling the truth or that she believed her, but rather made an inference based on her interactions with A.C. that A.C. was not exhibiting certain behaviors of coaching or suggestibility. Arnold testified that in her professional experience, these can be an issue when interviewing and counseling child victims.

We hold Arnold's statements were not improper, and defense counsel was not deficient for failing to object to them.

3. Prosecutorial Misconduct[17]

Finally, Cornelio argues his trial counsel failed to object to alleged prosecutorial misconduct during closing argument.[18]

Although prosecutors enjoy "wide latitude to argue reasonable inferences from the evidence," they "must 'seek convictions based only on probative evidence and sound reason.'" *In re Pers. Restraint of Glassman*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). To prevail on a prosecutorial

---

[17] Cornelio classifies this argument as an ineffective assistance of counsel claim, but instead argues under the framework for analyzing prosecutorial misconduct on direct appeal. We accordingly address this argument as an ordinary claim of prosecutorial misconduct in the context of PRP requirements that Cornelio show actual and substantial prejudice.

[18] Although Cornelio made several claims of prosecutorial misconduct in his direct appeal, none of them overlap with the statements he challenges in his PRP. Hence, this argument raises new points of fact and law that were not raised in the principal action. *See Davis*, 152 Wn.2d at 670-71. If there is doubt about whether two grounds are distinct, we resolve the doubt in the petitioner's favor. *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986).

misconduct claim, a defendant must show that the conduct was both improper and prejudicial "in the context of the record and all of the circumstances of the trial." *Id.*

In establishing prejudice where the defendant did not object at trial, the defendant is deemed to have waived the error unless the misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). In that case "the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Cornelio challenges the following segment of the State's closing argument, which followed its statement that A.C.'s testimony was all that was required to find the abuse beyond a reasonable doubt:

> Can you imagine a system where we did require something else? You have heard the testimony. Also, apply your common sense and experience here. Kids often don't tell about abuse that they have suffered until well after it's over and done with, or has been happening for years. It could be a period of months, but more often than not, it's years later, if they ever tell.
>
> . . . . Most of the time, 95 percent of the time, there is no physical findings. And according to the law, our law here in Washington State, that doesn't matter. You don't need that additional evidence.
>
> It doesn't matter that these things don't exist in this case. *In such a system, most children would have to be told, sorry, we can't prosecute your case, we can't hold your abuser responsible because there is nothing to corroborate what you are telling us and* [*no one*] *is going to believe a child.* We don't have a system like that. That's not how our system works. A child telling you what happened to them is evidence and it's enough.
>
> If more was required, *we couldn't hold the majority of abusers responsible, including this abuser.* We couldn't hold this defendant responsible for what he did to [A.C.].

VRP (Vol. VII) at 675 (emphasis added). Defense counsel did not object.

Cornelio compares these remarks to those in *State v. Thierry*, which we held constituted prosecutorial misconduct. In her opening argument, the prosecutor in *Thierry* stated:

> If the law required more, if the law required anything, something, anything beyond the testimony of a child, the child's words, [J.T.'s] words, those instructions would tell you that, and there is no instruction that says you need something else. And, again, *if that was required*, *the State could rarely*, *if ever*, *prosecute these types of crimes* because people don't rape children in front of other people and often because children wait to tell.

190 Wn. App. 680, 685, 360 P.3d 940 (2015), *review denied*, 185 Wn.2d 1015 (2016). After defense counsel's closing argument, in which counsel tried to rehabilitate Thierry's credibility and highlight inconsistencies in the child victim's statements and the victim's potential motive to lie, the prosecutor returned to her theme in rebuttal:

> [Defense counsel] says, "It's a good thing to tell kids, 'Tell someone if you've been abused. You're not going to get in trouble.'" She said, "It's a good thing to make sure that they know that they can tell when this has happened to them." That statement contradicts everything that she just stood up here and argued to you about. How is it a good thing when basically the crux of her argument is: "They aren't going to be believed. Children can't be believed. There's never any other physical evidence. We can't believe what they say because they make up stories," so *how is it a good thing to tell them that they should tell somebody because we're going to bring them in here to court to have a Defense attorney say, You can't believe them.*"
> . . . .
> [Defense counsel] wants you to basically disregard everything that [J.T.] has said between what he told [his mother], between what he told Ms. Arnold-Harms, between when he told his primary care provider Ms. Lin and what he told Amber Bradford. "Just disregard all of that because he's a child, because he was 8 when he said these things and because he was 9 when he was on the stand. Nothing he said is credible so just disregard it all." *If that argument has any merit, then the State may as well just give up prosecuting these cases, and the law might as well say that* "*the word of a child is not enough.*"

*Id.* at 687-88.

"It is improper for prosecutors to 'use arguments calculated to inflame the passions or prejudices of the jury.'" *Id.* at 690 (quoting *Glassman*, 175 Wn.2d at 704). *Thierry* reasoned that an argument that "'exhorts the jury to send a message to society about the general problem

of child sexual abuse' qualifies as such an improper emotional appeal." *Id.* (quoting *State v. Bautista-Caldera*, 56 Wn. App. 186, 195, 783 P.2d 116 (1989)). The court accordingly held that the comment was improper because it essentially told the jury that it needed to convict the defendant in order to allow reliance on the testimony of victims of child sex abuse and protect future victims. *Id.* at 691.

The prosecutor's comments in this appeal do not share the flaws present in *Thierry*. As noted, the prosecutor's message in Thierry was essentially that the jury needed to convict the defendant in order to allow reliance on the testimony of child victims in future cases and to protect future victims of such abuse. Here, the prosecutor instead highlighted the standard of evidence to make sure the jury understood that A.C.'s testimony alone may be sufficient to meet the State's burden of proof, should the jury find A.C. credible. The prosecutor's statement in this case merely reflected the law and did not have the inflammatory effect of the statement in *Thierry*. Because the statement was not improper, we need not consider whether Cornelio was prejudiced.[19]

### III. SIGNIFICANT CHANGE IN LAW

Cornelio argues that a significant change in law applies retroactively to his case and requires remand for a new sentencing hearing. Specifically, he argues that *State v. O'Dell*, a recent Washington Supreme Court decision issued after the imposition of his sentence, holds that trial courts should consider youth as a mitigating factor and gives courts the discretion to impose an exceptional sentence below the standard range applicable to adults. 183 Wn.2d 680, 358 P.3d 359 (2015), *review denied*, 189 Wn.2d 1007 (2017). He argues similarly that *State v. Houston-*

---

[19] For the same reason, we likewise need not address Cornelio's conclusory argument that defense counsel was ineffective for failing to object.

*Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), constituted a significant change in the law through its requirement that trial courts consider the characteristics of youth in sentencing for offenses committed while a juvenile.

A.     Legal Principles and Standard of Review

A restraint may be unlawful when there has been a significant change in the law which is material to the petitioner's sentence and sufficient reasons exist to require retroactive application of the changed legal standard.  RAP 16.4(c)(4).  A significant change in the law occurs "when an intervening appellate decision overturns a prior appellate decision that was determinative of a material issue."  *State v. Miller*, 185 Wn.2d 111, 114, 371 P.3d 528 (2016).  An intervening decision that "'settles a point of law without overturning prior precedent'" does not constitute a significant change in the law.  *Id.* at 114-15 (quoting *In re Pers. Restraint of Turay*, 150 Wn.2d 71, 83, 74 P.3d 1194 (2003)).  One test to determine whether a decision represents a significant change in the law is whether the defendant could have argued the issue in question before publication of the intervening decision.  *Id.* at 115.

B.     Significant Change in the Law

RCW 9.94A.535(1)(e) provides that a trial court may impose an exceptional sentence below the standard range if it finds mitigating circumstances, including impairment of the defendant's capacity to appreciate the wrongfulness of his conduct.  *O'Dell* held that "a defendant's youthfulness can support an exceptional sentence below the standard range applicable to an adult felony defendant, and that the sentencing court must exercise its discretion to decide when that is."  183 Wn.2d at 698-99.  The court explained,

> Until full neurological maturity, young people in general have less ability to control their emotions, clearly identify consequences, and make reasoned decisions than they will when they enter their late twenties and beyond.

*Id.* at 692. In drawing these conclusions, *O'Dell* relied on the reasoning and scientific information underlying the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), and *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

In rejecting O'Dell's argument that it should consider his age as a mitigating circumstance at sentencing, the trial court in *O'Dell* relied on *State v. Ha'mim*, which held that a defendant's age, alone, does not automatically support an exceptional sentence below the standard range applicable to an adult felony offender. *O'Dell*, 183 Wn.2d at 689; *State v. Ha'mim*, 132 Wn.2d 834, 847, 940 P.2d 633 (1997). The trial court in *O'Dell* interpreted this holding as "absolutely barring any exceptional downward departure sentence below the range on the basis of youth." *O'Dell*, 183 Wn.2d at 698. *O'Dell* reversed the trial court and specified that *Ha'mim* did not bar trial courts from considering youth at sentencing. *Id*. at 689. Rather, *O'Dell* characterized *Ha'mim* as holding "only that the trial court may not impose an exceptional sentence automatically on the basis of youth, absent any evidence that youth in fact diminished a defendant's culpability." *Id*. Hence, rather than directly overturning *Ha'mim*, *O'Dell* merely "disavowed" *Ha'mim*'s reasoning to the extent that it was inconsistent with its own. *Id*. at 696.

Cornelio argues that under *O'Dell* he is entitled to a new sentencing hearing so that the trial court can be allowed to consider his youth as a mitigating factor. Although Cornelio was tried and convicted as an adult, his crimes were committed when he was between 14 and 16 years old.

After both parties filed their briefs, our Supreme Court held that *O'Dell* did not constitute a "significant change in the law."[20] *In re Pers. Restraint of Light-Roth*, 191 Wn.2d 328, 422 P.3d 444, *reconsideration denied* (2018). *Light-Roth* reasoned that the *O'Dell* court had "explained that *Ha'mim* did not preclude a defendant from arguing youth as a mitigating factor but, rather, it held that the defendant must show that his youthfulness relates to the commission of the crime." *Id.* at 336. Hence, "RCW 9.94A.535(1)(e) has always provided the opportunity to raise youth for the purpose of requesting an exceptional sentence downward, and mitigation based on youth is within the trial court's discretion." *Id.*

Because we are bound by *Light-Roth*'s holding that *O'Dell* did not constitute a significant change in the law, we reject Cornelio's argument for resentencing based on *O'Dell*.

Cornelio also points to *Houston-Sconiers* as a recent expansion of the principles espoused in *O'Dell* justifying resentencing.[21] He notes that *Houston-Sconiers* held that "[t]rial courts must consider mitigating qualities of youth at sentencing and must have discretion to impose any sentence below the otherwise applicable [sentencing range]." 188 Wn.2d at 21.

As *Light-Roth* held, trial courts have always had this discretion to impose an exceptional sentence based on the youth of the defendant. This, however, does not resolve whether the *requirement* to consider the characteristics of youth significantly changes prior law. To answer

---

[20] Although *Light-Roth* interpreted the concept of "significant change in the law" for the purposes of the exceptions to the one year PRP time bar under RCW 10.73.090(1), its reasoning applies equally to that phrase's usage in RAP 16.4(c)(4).

[21] The State argues that Cornelio cannot rely on *Houston-Sconiers* because it was decided after his case was "final" for the purposes of retroactivity analysis. Br. of Resp't at 25, 26 n.3. But in the context of RAP 16.4(c), there is no need for the petitioner's case to be ongoing for us to consider whether there has been a significant change in the law that should be applied retroactively. As Cornelio's petition is timely, it need not meet the retroactivity criteria of RCW 10.73.100(6) as an exception to the one-year time bar under RCW 10.73.090(1). Rather, it must meet the retroactivity standard of RAP 16.4(c)(4).

that question, we follow *Miller*, 185 Wn.2d at 114, and ask whether *Houston-Sconiers* overturns a prior appellate decision that was determinative of a material issue. *Houston-Sconiers* does not overturn any such decision.

First, the requirement to consider youth in *Houston-Sconiers* did not overturn *Ha'mim*. As clarified by *O'Dell* and *Light-Roth*, *Ha'mim* did not preclude a defendant from arguing youth as a mitigating factor, but held that the defendant must show that his youthfulness relates to the commission of the crime. *Light-Roth*, 191 Wn.2d at 336. *Houston-Sconiers* recognized the constitutional differences between children and adults and required courts to consider the characteristics of youth in sentencing. 188 Wn.2d at 18. These principles do not overturn the holdings of *Ha'mim*, as clarified by *O'Dell* and *Light-Roth*.

For similar reasons, *Houston-Sconiers* also did not overturn *State v. Scott*, 72 Wn. App. 207, 866 P.2d 1258 (1993). Scott deemed the argument that youth limited the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law as one that "borders on the absurd." *Scott*, 72 Wn. App. at 218. However, *Light-Roth* also clarified that *Scott* did not categorically preclude consideration of youth, but rather, like *Ha'mim*, required the defendant to explain how his youthfulness related to the commission of the crime. 191 Wn.2d at 336. Although *Houston-Sconiers* repudiates the apparent attitude of *Scott*, it cannot be said to have overturned its holdings.

*Houston-Sconiers* merely "'settle[d] a point of law without overturning prior precedent,'" and so does not constitute a significant change in the law under RAP 16.4(c)(4). *Miller*, 185 Wn.2d at 114-15 (quoting *Turay*, 150 Wn.2d at 83). Cornelio's argument for resentencing based on *Houston-Sconiers* therefore fails.

No. 50818-4-II

Neither *Houston-Sconiers* nor *O'Dell* constitute a significant change in the law material to Cornelio's sentence. Therefore, Cornelio's petition for relief under RAP 16.4(c)(4) fails.

CONCLUSION

We deny Cornelio's petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, J.T.

We concur:

Worswick, P.J.

Johanson, J.

35