IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | |
| | ) | No. 36164-1-III |
| JOSHUA DAVID FLEMING, | ) | |
| | ) | |
| Petitioner. | ) | UNPUBLISHED OPINION |
| | ) | |

KORSMO, J. — In this personal restraint petition (PRP), Joshua Fleming alleges that his counsel performed ineffectively at trial and on appeal. We dismiss the PRP.

PROCEDURAL HISTORY

Mr. Fleming was charged in the Spokane County Superior Court with one count of first degree assault for stabbing Eric Stensgar 17 times, including one wound that punctured the skull. Mr. Stensgar underwent life-saving surgery, and the prosecutor filed a charge of first degree assault on May 21, 2012, 20 days after the attack.

The Interstate Agreement on Detainers was used to bring Fleming back from an Idaho prison. He arrived in Spokane County on August 23, 2013. While Fleming was enroute, Stensgar committed suicide. Police obtained a warrant to collect a DNA sample from Fleming. When inconclusive DNA results came back following testing of a jacket abandoned at the crime scene, the prosecutor dismissed the case without prejudice on October 16, 2013 and Fleming was returned to custody in Idaho.

During the 2013 period, public defender Steve Reich represented Mr. Fleming. Fleming had extensive criminal history, including ten adult felony and two separate prior "most serious offenses." Notice that the current charge was a "most serious offense" was also provided. If convicted, Fleming faced life in prison as a persistent offender.

Additional DNA testing was conducted on other areas of the coat and Mr. Fleming was determined to be a "major contributor" of the DNA found on the right sleeve of the jacket and on the two cuffs. Mr. Stensgar's blood was also found on the jacket sleeves. The first degree assault charge was refiled on February 27, 2014. Mr. Fleming was arraigned on March 11, 2014.

Initially, Mr. Reich again represented Mr. Fleming. Reich and the prosecutor discussed the possibility of pleading to an offense that would spare Fleming life imprisonment, but no agreement was reached. Mr. Fleming's family then hired Eric Christianson to undertake representation. Mr. Christianson appeared on Fleming's behalf on July 18, 2014. Christianson filed a notice of intent to use self-defense and seek State reimbursement, but later dropped that idea. Christianson did file a motion to obtain a DNA expert at public expense. The court granted the motion and appointed Dr. Donald Riley. However, Christianson did not consult with Dr. Riley. In a post-trial declaration, he stated that the State's DNA evidence was weak, so he did not waste public funds by using an expert.

The defense challenged the warrant used to obtain the DNA sample. The motion to suppress was denied. Mr. Fleming then waived his right to a jury trial. The case proceeded to a bench trial before the Honorable Harold Clarke III in March 2015. The primary issue at trial was identity. As we noted in Mr. Fleming's direct appeal, Judge Clarke summarized his reasoning this way:

> What that tells me is that Mr. Fleming had that coat on at some point in time. And to me this directly ties Mr. Fleming not just to the scene, but to the attack itself; because, again, the coat was being worn at the time of the assault, at least that is what the evidence tells me, and that is what I will so find. And it is clear that at some point in time Mr. Fleming had that coat on.
>
> Now, if you combine that with the fact that Mr. Fleming's fingerprints were found, so we know he was physically there at some point, we find his—it has been found, his DNA on the inside of that coat, we know at some time he was wearing that coat, and we know that coat was involved at some point in time in some way, shape or form.
>
> It clearly—and I said this a moment ago—but it clearly implies that whoever was wearing the coat committed the assault, and then decided to get rid of the coat because of the blood. That to me is patently clear.
>
> As counsel noted, it is a circumstantial case, and I appreciate that. As I said earlier, there are no eyewitness to the act. It's clear.
>
> But based on the totality of the circumstantial evidence, and particularly in the situation as I have described it with the coat, it appears to me that in fact Mr. Fleming did commit this act of assault, and I will find that beyond a reasonable doubt he did in fact commit the crime of first-degree assault against Eric Stensgar on May 1st of 2012.

Report of Proceedings (RP) (33644-1-III) at 294-295.

The court imposed the mandatory sentence of life in prison required by Mr. Fleming's persistent offender status. He appealed to this court. The primary issue presented was the sufficiency of the evidence.

3

A divided panel affirmed the bench verdict. *State v. Fleming*, No. 33644-1-III (Wash. Ct. App. Apr. 18, 2017) (unpublished), http://www.courts.wa.gov/opinions /pdf/336441_unp.pdf. Mr. Fleming also filed a personal statement of additional grounds (SAG) raising three issues, including a claim of ineffective assistance by trial counsel Christianson. That portion of the SAG attacked counsel's cross-examination of witnesses and his failure to consult with a DNA expert. As to the latter point, this court concluded:

> Similarly, the complaint that counsel should have pursued a DNA expert does not establish that counsel erred since there is no indication that an expert would have any useful information, let alone that it would have undermined confidence in the bench verdict.

*Id.*, slip op. at 15.

The Washington Supreme Court declined to review the appeal. This court issued the mandate on September 14, 2017.

Mr. Fleming, pro se, filed this PRP in this court on July 5, 2018. The petition raised four different claims of ineffective assistance, three involving Mr. Christianson and one involving his appellate counsel. The PRP included declarations by Dr. Riley and an attorney associate of Mr. Christianson's, but no declaration from Christianson. After receiving a response from the State, the acting chief judge determined that the claims involving trial counsel were not frivolous, appointed counsel for Mr. Fleming, and referred the matter to a panel. Appointed counsel was directed to file a brief in response

4

to the State's answer concerning trial counsel and was authorized to respond to other arguments.

After briefing was complete, a panel considered the petition without hearing argument.

ANALYSIS

The PRP alleges ineffective assistance by Mr. Christianson in three different ways, and also contends that appellate counsel was ineffective by failing to seek reconsideration of the direct appeal. Only two of the contentions merit any significant discussion. First, however, we address the standards governing review of this petition.

The burdens imposed on a petitioner in a PRP are significant. Because of the significant societal costs of collateral litigation often brought years after a conviction and the need for finality, relief will only be granted in a PRP if there is constitutional error that caused substantial actual prejudice or if a nonconstitutional error resulted in a fundamental defect constituting a complete miscarriage of justice. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 409, 114 P.3d 607 (2005). It is the petitioner's burden to establish this "threshold requirement." *Id.* To do so, a PRP must present competent evidence in support of its claims. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-886, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992). Hearsay is not permitted. *Id*. at 886; *In re Pers. Restraint of Moncada*, 197 Wn. App. 601, 605-608, 391 P.3d 493 (2017). More than a petitioner's self-serving statement is necessary to create the need for a

5

reference hearing since courts do not have to accept such statements at face value. *In re Pers. Restraint of Yates*, 180 Wn.2d 33, 43-44, 321 P.3d 1195 (2014) (Stephens, J., concurring); *State v. Osborne*, 102 Wn.2d 87, 97, 684 P.2d 683 (1984).[1]

If the facts alleged would potentially entitle the petitioner to relief, a reference hearing may be ordered to resolve the factual allegations. *Rice*, 118 Wn.2d at 886-887. A petitioner may not renew an issue that was addressed and rejected on direct appeal unless the interests of justice require reconsideration of that issue. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013).

Allegations that defense counsel failed to perform effectively are resolved under familiar standards. The Sixth Amendment to the United States Constitution guaranty of counsel requires that an attorney perform to the standards of the profession. Counsel's failure to live up to those standards will require a new trial when the client has been prejudiced by counsel's failure. *State v. McFarland*, 127 Wn.2d 322, 333-335, 899 P.2d 1251 (1995). In evaluating ineffectiveness claims, courts must be highly deferential to counsel's decisions. A strategic or tactical decision is not a basis for finding error. *Strickland v. Washington*, 466 U.S. 668, 689-691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under *Strickland*, courts apply a two-pronged test, evaluating whether or not (1) counsel's performance failed to meet a standard of reasonableness, and (2) actual prejudice

---

[1] A similar rule exists in summary judgment proceedings in civil cases. *E.g., Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

resulted from counsel's failures. *Id*. at 690-692. When a claim can be disposed of on one ground, a reviewing court need not consider both *Strickland* prongs. *Id*. at 697.

### *Christianson*

The petition alleges that trial attorney Christianson erred during plea negotiations, erred in not using a DNA expert at trial, and had a conflict of interest due to his consideration of self-defense (and State reimbursement) before trial. We address the DNA argument first, before turning to the negotiations and conflict of interest claims.

*DNA Expert.* We address this argument first because we already have considered this claim on the direct appeal in conjunction with the SAG filed by Mr. Fleming. He makes no effort to convince us that we should revisit the argument.

A PRP is not permitted to repeat arguments previously raised and rejected in an earlier PRP. *In re Pers. Restraint of Haverty*, 101 Wn.2d 498, 503, 681 P.2d 835 (1984). Similarly, a PRP can only renew an argument made on appeal in very limited circumstances. *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 687-688, 717 P.2d 755 (1986). As explained there:

> Hence, we hold the mere fact that an issue was raised on appeal does not automatically bar review in a PRP. Rather, a court should dismiss a PRP only if the prior appeal was denied on the same ground and the ends of justice would not be served by reaching the merits of the subsequent PRP. By "ground" we mean simply a distinct legal basis for granting relief.

*Id*. at 688. The "ends of justice" will merit renewed consideration of an issue if the petitioner establishes he was actually prejudiced by an error. *Id*. In essence, this

7

limitation creates an exception to the law of the case doctrine where a petitioner can show prejudicial error.

Although Mr. Fleming makes no effort to explain why we should revisit the issue, his ineffective assistance claim necessarily requires that he attempt to establish that he was prejudiced by Christianson's failure to consult with Dr. Riley.[2]  Thus, the petition unintentionally makes his best argument for why we should address this claim.  Actual prejudice flowing from Christianson's failure to consult would establish a basis for considering the argument.

Of course, the appeal already rejected the contention that the failure to consult with Dr. Riley was prejudicial error.  The next question is whether there is any new evidence presented in this action that requires that we change that assessment.  Dr. Riley, after reviewing the relevant discovery materials, provided declarations stating concern over the possibility of contamination flowing from laboratory procedures and suggested that an expert review the DNA evidence.  Appointed counsel obtained a declaration from a forensic scientist, Marc Taylor, who made similar accusations that trial counsel had not adequately investigated the possibility of contamination and that the defense should have sought the electropherograms generated in the testing process.  Although the head of a

---

[2] Although the petition argues that Christianson did not consult *any* expert, the record does not support that conclusion since Christianson did not provide any evidence in this action.  We discuss that topic in the next section.  The record *suggests* that he did not contact any expert, but it *establishes* only that he did not contact the appointed expert.

8

laboratory that does DNA testing, Mr. Taylor did not attempt to conduct his own DNA testing of the jacket. Defense attorney Gary Davis reviewed the declarations filed in this case and the trial court's findings and concluded that Christianson did not investigate the case properly. He also opined that proper use of Dr. Riley would have led to a different outcome.

The evidence presented by the PRP is geared at establishing that Christianson performed deficiently by not consulting with Dr. Riley. The evidence does not establish that the outcome of the case would have been different if Dr. Riley had been consulted. Riley, like Taylor, pointed to the possibility, but not the actuality, of contamination. In contrast, the State presented declarations from the evidence technician and the DNA technician that there was none. Although Mr. Fleming can speculate that there was contamination, he has no evidence that this was the case.

Similarly, Mr. Fleming did not seek further DNA testing, despite the ability to do so. RCW 10.73.170. His experts did not review the physical evidence. They did not review the testimony of the laboratory technician, nor did they review the cross-examination that Christianson undertook.[3] They did not provide any new evidence that

---

[3] The cross-examination of the technician focused on the initial testing, the presence of multiple people's DNA on the inside of the jacket, the possibility of contamination during testing, and the fact that it was not possible to determine when any of the DNA was deposited on the jacket. Many of these same areas are suggested by Mr. Fleming's experts. The inability to determine when any of the DNA was deposited was also the basis for the defense's attack on the fingerprint evidence.

Christianson should have developed at trial and explained how the verdict would have been undercut by the new evidence. In short, they have provided additional impeachment-type questions that could have been asked or argued, but no evidence of substance.

*Strickland* requires that a petitioner demonstrate actual prejudice. Better cross-examination might have been useful, but Fleming simply has not demonstrated he had any additional evidence that could have been developed.[4] Instead, he has been content to treat this petition as if he were defending the case at trial and argue the potential weaknesses of the State's case. While that is a tried and true method of *trial* defense, it fails to meet the affirmative burden of establishing prejudicial error in a PRP. The PRP needs more than speculation; it needs to present admissible evidence demonstrating the harm from counsel's error. *Rice*, 118 Wn.2d at 885-886. Simply demonstrating that "mistakes were made" is only the first half of a petitioner's burden. In a PRP, and particularly in a PRP attempting to reargue a position argued on direct appeal, more is necessary. And there is no "more" here.

---

[4] As we noted in the direct appeal, weak cross-examination does not establish prejudicial error. "However, even a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 489, 965 P.2d 593 (1998).

Mr. Fleming has not given us a reason to revisit our ruling in the direct appeal. He has not demonstrated that his trial attorney prejudicially harmed the trial of his case.

*Plea Bargaining.* The petition next argues that counsel failed to communicate Mr. Fleming's acceptance of a plea offer. His argument misconstrues the record and also belies his own statement in open court. No agreement was ever reached, let alone accepted by both sides. This argument is without merit.

Initially, we note that this claim, and the following one, arguably are barred by *Taylor* due to Mr. Fleming's challenge on appeal to Christianson's effectiveness. Traditionally, the "grounds" for barring renewed consideration of an issue already decided on appeal were broadly construed; one could not argue a new theory of trial counsel's ineffectiveness where a different theory was rejected on appeal. *E.g.*, *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004); *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 719-720, 16 P.3d 1 (2001). In those instances where prejudice could be established, a PRP could revisit a ground previously resolved on appeal. *Taylor*, 105 Wn.2d at 688.

The parties both reference a statement from the plurality opinion in *In re Pers. Restraint Khan*, 184 Wn.2d 679, 363 P.3d 577 (2015), as a relaxation of the *Taylor* standard. *Id*. at 689. We disagree. The case example[5] used by *Khan* is itself an example

---

[5] *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 16 P.3d 601 (2001).

of the *Taylor* standard being satisfied in order to allow the PRP to revisit a ruling. The

*Khan* plurality likewise concluded that the petitioner had made a sufficient showing of

actual prejudice to justify a reference hearing. *Id*. at 691-692. Nonetheless, the State

does not challenge Mr. Fleming's ability to raise his remaining claims, so we, too, will

consider them.

The controlling law is clear. There is no constitutional right to a plea deal. *State*

*v. Moen*, 150 Wn.2d 221, 226-227, 76 P.3d 721 (2003). However, when plea

negotiations occur, a defendant has a constitutional right to effective assistance of

counsel. *State v. James*, 48 Wn. App. 353, 362, 739 P.2d 1161 (1987). Counsel must

discuss the State's offers and help the defendant make an informed decision on whether

to take a plea deal, such as strengths and weaknesses in the case if it proceeds to trial. *Id*.

This includes adequate investigation into the case facts and likelihood of conviction.

*State v. Edwards*, 171 Wn. App. 379, 394-395, 294 P.3d 708 (2012). When reviewing a

claim of failure to advise a defendant about a plea deal, the appellate court considers

"whether defense counsel communicated the offers to the defendant and whether the

defendant has demonstrated a reasonable probability that the defendant would have

accepted the offer." *Id*. at 394.

This issue suffers from lack of evidence from Christianson. Neither[6] party appears to have sought an affidavit from him.[7] A statement made by Mr. Fleming in open court while arguing his motion for a new trial, but not included or explained in the petition, helps understand the context of the information he does present:

> I had been one hundred percent against negotiations in this matter from the start. That was with my public defenders, that was with trial counsel; that any attempts at negotiations—these things were done on their own with the attempts to convince me, hey, you know, this, this or that.

RP (33644-1-III) at 355. The statement was made while complaining about counsel's failure to object to the prosecutor discussing a rejected plea proposal to third degree assault following a motion hearing on January 8, 2015.

When Christianson replaced Reich in July 2014, the prosecutor summarized the current state of plea negotiations in an e-mail. The prosecutor had approval to enter into an agreement for a ten-year sentence, while the defense was insisting on five years. Resp'ts Supp. Br., App. F at 6. A month later, Christianson advised the prosecutor that his client had "declined" the ten-year offer. *Id*. at 8.

Further discussions between the attorneys ensued. By the time of the January 8, 2015 motion hearing, it appears that the attorneys were attempting to determine what Mr.

_____

[6] An attack on counsel's representation permits the attorney to respond and is a waiver of the attorney-client privilege to the extent necessary to respond to the claim. RPC 1.6(b)(5); *State v. Cloud*, 95 Wn. App. 606, 976 P.2d 649 (1999); *Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003).

[7] The State has not requested that the missing witness inference be applied, so we need not consider that question.

Fleming was willing to accept in the area of a five-year sentence. Whether the offer was subject to final approval by her supervisors is unclear, but the prosecutor did discuss terms of a sentence for a single class C felony conviction with defense counsel in Mr. Fleming's presence. Resp'ts Br., Attach. A at 1-3. But, whether a firm offer or merely a discussion proposal, Mr. Fleming definitely rejected it and objected to the attorneys discussing it in his presence at the conclusion of the hearing. *Id*. Subsequent email communications provide some details.

On the following afternoon, Christianson asked deputy prosecutor Sharon Hedlund what the proposal had been.[8] *Id*. at 5.[9] She replied:

> Pg Assault 3, low end of 51 months, cfts since 082313 (when he was first booked into our jail on charge—504 days as of today) + ½ of time he spent in Idaho prior to being brought over (from 050212 to 082213 = 477 days so ½ = 238.5).

> So as of today he would have 743 days or 24.75 months served—he'd be looking at about 9.25 left to serve.

*Id*. at 4-5. Two days later Christianson met with Fleming in the jail. *Id*. at 8. A mere 43 minutes afterwards, Christianson sent the prosecutor a proposal: "he will take a deal if it is time served and NO community custody, so he can just go back to his family immediately. . . . Let me know if you are interested." *Id*. at 4. The prosecutor expressed

---

[8] "Can you give me the specifics on Flemings offer again?" Resp'ts Br., Attach. A at 4.

[9] The petition has the same e-mail, unpaginated, in Appendix J. We cite to the respondent's copy due to the pagination.

skepticism, but stated that she would run it by her supervisors. *Id*. The following day she reported that her immediate supervisor had rejected the proposal. *Id*. The basis for the rejection is not identified.

Mr. Fleming now argues that (1) the prosecutor reoffered the rejected proposal, (2) he accepted it during his meeting with Christianson and asked his attorney to also seek credit for time served in Idaho, (3) Christianson failed to communicate his acceptance of the renewed offer, and (4) falsely told the prosecutor he would only plead guilty if he was released immediately without a reporting obligation. Although there are multiple problems with these allegations, one of them is dispositive. There is insufficient evidence that Mr. Fleming accepted the previously rejected plea offer.

The only evidence that Mr. Fleming accepted the January 8 offer is his own declaration. In many cases that probably would be sufficient to justify a reference hearing. *In re Pers. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 362 P.3d 758 (2015). Here, however, it is not. Mr. Fleming's entire approach to plea bargaining in this case, the absence of supporting testimony from his attorney, the written record, and his ensuing behavior all undercut the argument.

As previously noted, it takes more than a petitioner's self-serving statement to create the need for a reference hearing since courts do not have to accept such statements at face value. *Yates*, 180 Wn.2d at 43-44 (Stephens, J., concurring); *Osborne*, 102 Wn.2d at 97. But that is all that Mr. Fleming has in this instance.

His statement is inconsistent with the rest of the entire record. During the motion for a new trial, Mr. Fleming forcefully told the court that he was "100 percent" against negotiating the case. That is not the statement of a man who allegedly accepted a plea agreement only to have it yanked out from underneath him. He would at least acknowledge that he had tried, and thought he had succeeded, in settling the case short of trial. He would not be decrying the efforts of the attorneys to reach a settlement.

The absence of an affidavit from Christianson is a particularly obvious defect in the petitioner's proof. Even if it is unlikely that a member of the Bar would admit lying to his client or the prosecutor, Christianson could still have provided information concerning his purpose in meeting with his client following the rejected January 8 offer. The record of this proceeding does not even indicate that Fleming sought Christianson's testimony.

The absence of supporting evidence and the statement that he was against all negotiations is not the end of it. Mr. Fleming appeared in court on multiple occasions and did not raise the issue of a guilty plea. He several times met with Christianson and staff in the build up to trial, but does not report seeking information about the failed plea and did not ask them to try again. Upon learning that his plea had been rejected, Mr. Fleming did not attempt to learn what aspect of his offer the prosecution found unacceptable, he made no effort to enforce the offer or question his attorney about it, and he did not present any other offers to the prosecutor. He presents no suggestion that the prosecutor ended all

16

negotiations. He did not couch his own offer, if there was one, in take-it or leave-it terms. In short, he did not behave like a negotiator who was still seeking settlement. The most that can be said was that he acted like someone whose one and only acceptable deal had been rejected and now no longer had any interest in settlement.

But Mr. Fleming's statement in court that he was 100 percent against negotiations and that the attorneys were engaging in them on their own does explain what actually was going on. The parties had deadlocked before Christianson appeared in the case. The prosecutor and the new attorney continued to explore settlement possibilities despite Mr. Fleming's rejection of the idea. The prosecutor eventually offered a settlement, apparently subject to the approval of her supervisors, along the lines of what Reich had indicated his client might accept. When that offer failed, Christianson went to determine if Fleming might change his mind or if there was some other settlement his client would accept that he might be able to sell to the prosecutor. After Fleming finally[10] approved an approach, Christianson then conveyed that information to Hedlund, who passed it on to

---

[10] The timing of these actions also is very telling. The prosecutor's lenient offer was extended (and rejected) at the conclusion of a dispositive motion hearing that Mr. Fleming lost. Normally a prosecutor has no incentive to enter into any negotiations after winning a contested motion, let alone make a more attractive offer. The only apparent reason for extending the offer at that time was in anticipation of Fleming being more likely to engage in negotiations after his chance of obtaining dismissal had failed. The failure of the motion may also explain why Mr. Fleming now was willing to make his own plea offer.

her immediate supervisor. The rejection of that proposal by the prosecution without a

counter-offer showed that negotiations were at an end. Final trial preparation ensued.

Fleming did not accept a renewed plea offer.[11] The claim that Christianson failed

to convey Fleming's acceptance fails on these facts.

*Self-Defense.* The petition's last challenge to Christianson's performance is a

contention that the attorney had divided loyalties because he explored the possibility of

arguing self-defense. This argument is without merit.

The attorney explored the possibility of arguing self-defense and seeking

reimbursement from the State pursuant to RCW 9A.16.110 upon a jury finding that self-

defense was justified. The defendant must state the general nature of his trial defense.

CrR 4.5. In order to put self-defense before the jury, a defendant must present evidence

that he acted in self-defense. Accordingly, a defendant intending to use self-defense is

required to notify the court and prosecutor. Christianson did so here.

From that common and unremarkable fact, Mr. Fleming argues that Christianson

had a conflict of interest. His conclusion is without basis in logic or reason. There is no

---

[11] The PRP also cites to the prosecutor's affidavit where she stated that Fleming had multiple opportunities to reconsider the offer when he made court appearances prior to trial (*See* Attach. A at 2-3) as evidence that the offer remained open and that Christianson erred by not telling him. That claim misreads the affidavit, which states that Mr. Fleming rejected the prosecutor's offer and the State rejected his counter-offer. The statement then noted the many opportunities Mr. Fleming had to make an offer of his own or reconsider his previous rejection. It also is difficult to imagine that, if Fleming believed he had accepted a plea offer, he would not have made use of his subsequent court appearances to inquire when his guilty plea would occur.

evidence that Christianson tried to offer the defense at trial against his client's wishes or that his exploration of the possible defense negatively impacted his trial performance.[12]

No evidence was presented at trial that Fleming acted in self-defense. There could be no conflict of interest on these facts.

*Appellate Counsel*

Lastly, Fleming argues that his appellate counsel performed deficiently by not seeking reconsideration of this court's decision before filing the petition for review with the Washington Supreme Court. There is no obligation on counsel to file a motion for reconsideration.

The petition presents no authority suggesting counsel erred. It also misunderstands the nature of appellate review. The Washington Supreme Court will review a decision of this court in an appeal pursuant to the criteria of RAP 13.4(b). At issue in the appeal was whether Judge Clarke's findings of fact supported his conclusion that Mr. Fleming assaulted Mr. Stensgar. At issue in the petition for review was whether this court erred in concluding that those findings supported his conclusion.

---

[12] It is difficult to imagine that Christianson could have properly prepared for trial without considering the possibility of self-defense. Physical evidence put Fleming at the scene of the crime; an attorney would have to investigate defenses that innocently explained his presence. In addition, Fleming has never indicated what he ever told his attorney about the incident. For all this court knows, Fleming told Christianson he was present and needed to act in self-defense.

Reconsideration was unnecessary to making that argument. Appellate counsel did not perform deficiently.

Mr. Fleming has not established that either his trial or appellate counsel rendered constitutionally deficient performance that resulted in a miscarriage of justice. The death of Mr. Stensgar left the prosecution with solely a circumstantial case. Such cases often present close factual questions for the trier-of-fact to weigh and, thus, result in trials. This case was of that variety. Just as our review of the evidence in the direct appeal led to the conclusion that Judge Clarke was justified in returning a guilty verdict, our review of Mr. Fleming's evidence and argument in this petition leads to the conclusion that any error by trial counsel would not have changed the outcome of the case.

It also leads to the inescapable conclusion that Mr. Fleming desired to gamble on an acquittal rather than serve additional time in jail pursuant to a plea agreement despite the risk that he would serve the rest of his life in prison if it failed. A risk minimizer would not have let the initial five year gulf between sentencing recommendations dissuade him from reaching an agreement, and such a person would not have let a nine-month period stand in the way of pleading guilty. He also would not have awaited the outcome of his motion to dismiss before accepting a favorable offer. In short, Mr. Fleming's approach to the plea offers in this case demonstrates that he desired to try the case despite the risk of an exceptionally negative outcome. His statement to the court that he was 100 percent against plea negotiations, despite the efforts of both the

20

prosecutor and defense counsel, further supports the view that he simply had no desire to plead guilty.

The petition is dismissed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

I CONCUR:

_____
Siddoway, J.

No. 36164-1-III

PENNELL, C.J. (dissenting) — I disagree with the majority's assessment of Joshua David Fleming's ineffective assistance of trial counsel claims. The majority opinion makes improper factual findings and fails to recognize the evidence submitted by Mr. Fleming in support of his claim of prejudice. I would grant Mr. Fleming's petition for relief.

## ANALYSIS

*The DNA[1] expert*

The first question in an ineffective assistance of counsel challenge is whether counsel's performance was constitutionally sufficient. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). One requirement of adequate representation is a reasonable defense investigation conducted according to prevailing professional norms. *Id.* at 690-91. Defense counsel must be afforded a wide range of deference in assessing how to handle a particular case. *Id.* However, when an attorney makes a judgment call based on ignorance or lack of investigation, no deference is due. *See Andrus v. Texas*, ____ U.S. ____ , 140 S. Ct. 1875, 1881-82, 207 L. Ed. 2d 335 (2020).

---

[1] Deoxyribonucleic acid.

No. 36164-1-III
*In re Pers. Restraint of Fleming* (Dissent)


I agree with Mr. Fleming that his attorney's failure to consult with a DNA expert constituted deficient performance.[2] The case against Mr. Fleming rested entirely on forensic evidence, the most important piece of which was a DNA sample found on a blood-stained jacket. The trial court convicted Mr. Fleming based largely on expert testimony that Mr. Fleming was the major contributor to the DNA mixture found in the sample. Particularly given defense counsel's confession that he lacked a firm grasp of DNA evidence,[3] expert consultation was necessary in order to assess the State's key piece of evidence. *See In re Pers. Restraint of James*, 190 Wn.2d 686, 690, 416 P.3d 719 (2018) (deficient performance for attorney not to understand DNA evidence).

---

[2] Contrary to the majority's suggestion, the record is sufficient to support Mr. Fleming's claim that his attorney never consulted a DNA expert. The attorney admitted as much in a posttrial pleading. He declared he did not hire an expert, despite being provided court-authorized funds, because he thought the State's case was "so weak and full of holes" that the DNA evidence "did not hurt Defendant." Pers. Restraint Pet. (PRP), App. O (Decl. of Eric M. Christianson) at 2. The attorney believed that "unless [he] had a good faith belief that there would be something the DNA expert could add to the case, he ha[d] a duty to preserve public funds." *Id.* The majority claims the attorney's declaration only demonstrates he did not consult with the court-appointed expert. According to the majority, the attorney might still have consulted with some other expert. This is not a reasonable interpretation of the record. Given the attorney did not think money would be well spent on an expert and that experts are not free, the only sensible inference from his statement is that he did not consult with any expert at all. To the extent the record leaves this issue in doubt, it is at least sufficient for a reference hearing.

[3] In his motion for appointment of an expert, Mr. Christianson stated DNA evidence "is highly technical and beyond the scope of my expertise." PRP App. I (Mot., Decl., & Order for Appointment of DNA Expert at Pub. Expense) at 2.

2

Because counsel's performance was deficient, the only remaining question is prejudice. *Strickland*, 466 U.S. at 687. Mr. Fleming has submitted two declarations from DNA experts, explaining the type of testimony they would be able to provide had they been consulted. The majority criticizes this new information as unhelpful because it does not include retesting. But retesting is not the only way (and likely not the primary way) a DNA expert can be helpful to the defense. Mr. Fleming does not need to disprove the DNA evidence in order to show he was prejudiced by the lack of expert consultation. The importance of DNA expert consultation is much more complex.

In Mr. Fleming's case, an important issue was assessing the significance of various quantities of DNA found on the blood-stained jacket. The State's trial expert testified, "there is a lot more DNA from the major contributor [i.e., Mr. Fleming] than from all those other[ sources] combined." 1 Report of Proceedings (RP) (Mar. 16, 2015) at 160. She also claimed the DNA on the cuff was "definitely from someone that had contact or put bodily fluid on that specific area." *Id*. at 168.

From the State's expert's testimony, one might assume the DNA attributed to Mr. Fleming on the jacket's cuff was significant—so much so that Mr. Fleming must have been the one wearing the jacket. After all, a quantity that exceeds all other quantities combined sure seems like a lot.

The new information submitted by Mr. Fleming directly contradicts the testimony of the State's expert and places it into perspective. According to a declaration filed by Dr.

3

Donald Riley, the DNA evidence in Mr. Fleming's case was "weak." Pers. Restraint Pet. (PRP) App. N (Decl. of Donald Riley, PhD) at 1. He explains, "[t]he quantity of DNA said to be consistent with the defendant on the sleeve of a jacket was an extremely low quantity consistent with low-level contamination that wouldn't necessarily involve direct contact." *Id*. at 2. Had Dr. Riley been called as a witness, the fact finder would have had a basis for doubting the State's expert's bald claim that the DNA on the sleeve "definitely" came from direct contact. 1 RP (Mar. 16, 2015) at 168.

Dr. Riley's input was important because the assault on the victim, Eric Stensgar, took place at a location referred to as a transient camp. According to witness testimony, numerous individuals frequented the area and used it to drink, smoke, and sleep. The unique character of the crime scene increased the possibility of multiple individuals touching or wearing the same items as well the potential for cross transfer of genetic material at the site.

Had the trial judge been informed that the DNA found on the jacket was not as potent as characterized by the State's expert, there is a reasonable probability that the outcome of trial would have been different. The State's evidence in this case was already weak—so much so that I would have found it insufficient. *State v. Fleming*, No. 33644-1-III, slip op. at 18-23 (Wash. Ct. App. Apr. 18, 2017) (Pennell, J., dissenting) (unpublished), https://www.courts.wa.gov/opinions/pdf/336441_unp.pdf. Not much was

necessary to make the State's case against Mr. Fleming even weaker. I would find Mr. Fleming has shown prejudice.

*The plea offer*

In addition to his arguments regarding the DNA expert, Mr. Fleming claims his attorney was ineffective for failing to relay his acceptance of a plea offer. The majority rejects this challenge based on lack of factual support. While noting Mr. Fleming has filed a sworn statement that he did, in fact, accept the plea offer, the majority rejects Mr. Fleming's statement as self-serving. I disagree.

Mr. Fleming's claim that he accepted the State's offer has at least some support in the record. Mr. Fleming's initial attorney has filed a declaration stating Mr. Fleming was amenable to the type of offer eventually made by the State. PRP App. E (Decl. of Steve Reich) at 2. In addition, the offer in question was for little more than four years. This was far below the life sentence Mr. Fleming was facing should he be convicted as charged. The significant value of the offer is, by itself, compelling evidence that the offer was likely accepted.

It is not for this court to speculate as to whether Mr. Fleming and the State exhibited a willingness to actually settle the case. A hearing should be held to determine what happened and why. I would order that the superior court address these factual matters instead of deciding them in this forum.

CONCLUSION

Mr. Fleming's PRP has merit. I would either grant him relief or refer the matter

for an evidentiary hearing. I therefore dissent.

_____
Pennell, C.J.